UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


| | |
|---|---|
| LENA VERN DANDRIDGE, et al. | CIVIL ACTION NO.: 64-14801 |
| *vs*. | SECTION: N(2) |
| JEFFERSON PARISH SCHOOL BOARD, et al. | JUDGE: KURT D. ENGELHARDT |

# **O R D E R and R E A S O N S**

Before the Court are two motions: the "Advanced Studies Magnet Plan" (Rec. Doc. 186) (hereinafter "Magnet Plan") and the the Motion for Approval of New Magnet Programs (Rec. Doc. 182) (hereinafter "New Magnet Programs Motion"), both submitted by the Jefferson Parish School Board ("JPSB").

The unopposed New Magnet Programs Motion was filed on July 17, 2008. By order of this Court, consideration of this motion was deferred until the entire Magnet Plan could be considered. *See* Order of July 22, 2008 (Rec. Doc. 183). The motion to approve the Magnet Plan is also unopposed but went to a fairness hearing on December 12, 2008, at which several members of the community spoke against the proposal. The Court has also received several dozen letters concerning the Magnet Plan, generally opposed but with many favorable comments, as well as supplemental memoranda requested by the Court at the hearing on the 12th. After considering both motions, original and supplemental memoranda, and the comments offered at the hearing and submitted by the public in writing, the Court rules as set forth herein.

1

## I. BACKGROUND

The long history of this case was adequately described by the Court in its ruling from the bench on March 14, 2008, and need not be recounted here. *See* Tr. at 3-7 (Hearing of March 14, 2008). For present purposes, it is enough to note that on March 8, 2007, the Court issued an order directing the parties to jointly (a) identify conditions or facets of the operations of the Jefferson Parish Public School System (the "school system") in which pockets of inequality no longer exist and in which the school system's operations are in compliance with the Constitution; (b) identify conditions or facets of the operations of the school system where further remedial action may be required to bring the school system into compliance with the Constitution; and (c) provide the Court with a proposed plan in the form of a consent order, prepared through good faith efforts conducted in close cooperation, that when fully implemented by the JPSB will bring the remaining facets of the operations of the school system into compliance with the Constitution. *See* Order of March 8, 2007 (Rec. Doc. 117) (Zainey, J.).

Pursuant to that order, the parties jointly presented to the Court a motion listing suggested modifications to existing orders. *See* Joint Mot. For Approval (hereinafter "Joint Motion") (Rec. Doc. 132). On March 14, 2008, the Court approved portions and rejected other portions of the proposed order with instructions to revise it and report back to the Court within a specified time. Tr. at 16-27 (Hearing of March 14, 2008). On May 14, 2008, a fairness hearing was held regarding the revised proposed order and the order was approved. *See* Order of May 14, 2008 (hereinafter "May 14th Order") (Rec. Doc. 164). That order excluded from its provisions the Jefferson Parish magnet schools and decreed that a new consent order for those schools be submitted on or before November 1, 2008. *Id.* at ¶6. In the meantime, the school system was

authorized to continue to utilize its existing magnet schools, and students attending those schools were allowed to continue in them through the schools' terminal grade, regardless of where in the Parish they resided. *Id* at ¶¶5-6. As part of the operation of magnet programs prior to approval and implementation of the Magnet Plan, the JPSB also seeks the Court's approval of new arts and Montessori magnet programs at Washington, Ames, Clancy, and Lincoln elementary schools, all racially-identifiable black schools. *See* New Magnet Programs Motion at ¶¶1-2.

The new Magnet Plan was submitted on October 30, 2008. The plan requires students on the respective banks of the Mississippi to attend a magnet school on their home bank and equalizes the offerings on each side of the river. Under the proposal, magnet students on the West Bank in grades K-5 will be served by Gretna No. 2 and Ruppel elementary schools. Magnet students in grades 6-8 will be housed at Thomas Jefferson Middle School. Magnet students in grades 9-12 will be housed at the site of the former Archbishop Blenk school. All of these programs are either new or existing programs. On the East Bank, magnet students in grades K-6 will be housed at Hazel Park and Metairie Academy elementary schools, while magnet students in grades 7-12 will be housed at Haynes Academy. Metarie and Haynes Academy are existing magnet programs, but Hazel Park is an existing elementary school that, under the plan, would be converted into a magnet school. All other aspects of the program–such as course offerings; teacher hiring, training, and credentialing; program size; and sports and other extracurricular offerings–are described as identical on both banks of the river.

## II. ANALYSIS

### A. Considerations for "Fairness" of Proposed Consent Orders

The Court applies to both these proposed consent orders the same legal standard that it

applied in issuing its May 14th Order: settlements that are reasonable, fair, and adequate are subject to approval. The reason for requiring Court approval is to protect the rights of absent persons or non-parties whose interests may be compromised by the settlement. In most cases, the parties are free to settle a lawsuit without Court oversight, particularly when those are suits in ordinary litigation brought by one private party against another private party that will not affect the rights of any other persons. Approval of a consent order, however, requires careful Court scrutiny. The settlement must be valid under contract principles and must be fair, adequate, and reasonable. But when a consent decree contains injunctive provisions or has prospective effect, the district court must be cognizant of and sensitive to equitable considerations.

Even when a consent decree affects only the parties, the Court examines it carefully to ascertain not only that it is a fair settlement but also that it does not put the Court's sanction to, and power behind, a decree that is unfair or in violation of the Constitution, statutory authority, or established jurisprudence. This requires a determination that the proposal represents a reasonable factual and legal determination based on the facts of the record, whether established by evidence, affidavit, or stipulation. If the decree also affects third parties, the Court must be satisfied that the effect on them is neither unreasonable nor proscribed. While ordinary contract principles would not allow one party to a consent decree to unilaterally withdraw, the district court's discretion to disapprove the consent decree can negate the agreement.

It is also important to note that, although the Court has the power to approve or reject a settlement negotiated by the parties, the Court may not require the parties to accept a settlement or a consent order to which they have not agreed. Whereas changed circumstances may justify a Court-ordered modification of a consent decree over the objections of a party after the decree has

4

been entered, and the district court might advise the parties that it will not approve their settlement proposal unless one or more of its provisions were deleted or modified, the Court does not have the power to modify a proposed consent decree and to order its acceptance over either party's objection.

In reviewing the standard applicable to these orders, the Court finds instructive the Fifth Circuit case of *Ibarra v. Texas Employment Commission,* 823 F.2d 873 (5th Cir. 1987), and Judge Sear's opinion in *Blanchard v. Forest,* 1996 WL 28526 (E.D. La. 1996). While those cases do not specifically relate to desegregation matters, they are instructive and provide guidance with regard to the factors to be considered when evaluating a consent order and/or settlement for approval at a fairness hearing. The burden of proving fairness is on the parties offering the consent order for approval.

**B. Analysis of the Motion for New Magnet Programs**

The new magnet programs proposed by the JPSB are housed at racially-identifiable black schools, two on each side of the river. *See* Motion for New Magnet Programs at ¶4. These schools will house new arts and Montessori magnet programs, one on each bank. *Id.* Importantly, the institution of magnet programs at these schools does not change the present school attendance zones. Students attending these schools will be automatically enrolled in these programs, though if a parent or guardian objects, a student may be enrolled in another school in the area. *Id.* at ¶4. Students from other schools may also apply to attend these schools, with admission by lottery, but as a desegregation tool white students will be given a preference for admission. *Id.* at ¶3. The academic offerings will be balanced, with substantially similar educational opportunities–in terms of implementation of nationally recognized, high-quality

5

curricula by highly trained personnel–and substantially similar facilities on both sides of the river. *Id.* at ¶¶5-7. The Court finds that this proposed settlement is fair, reasonable, and adequate, and especially notes that approval of this plan may cause an increase in the number of desegregated schools in the school system. Accordingly, **IT IS ORDERED** that the Motion for Approval of New Magnet Programs is **GRANTED**.

**C. Analysis of the Magnet Plan**

Throughout this litigation, the Court has repeatedly noted that its sole concern, and the sole issue before it, was "compliance with the United States Supreme Court and the United States Fifth Circuit Court of Appeals jurisprudential guidelines regarding desegregation of student bodies, faculty, staff, and administration." Tr. at 59 (Hearing of May 14, 2008). While the Court is cognizant of, and sympathetic to, individual cases in which acceptance or rejection of the Magnet Plan would work a hardship for parents or children, nonetheless the Court must focus on ensuring the school system's compliance with that desegregation jurisprudence.

Further, given the extensive history of this litigation, which is now forty-four-and-a-half years old, the Court must look towards its stated goal of closing this case with a declaration that the school system has achieved unitary status. To that end, the Court issued the May 14th Order pursuant to a 36-month deadline, after which compliance with the decree would, hopefully, result in the achievement of unitary status. *See* Tr. at 15 (Hearing of March 14, 2008) (finding that consent order failed "fairness" standard because it lacked a reasonable termination date); Tr. at 64-66 (Hearing of May 14, 2008) (noting three-year deadline for completion of tasks). In order to facilitate the achievement of unitary status, the May 14th Order included an extensive and minute student attendance zone plan specifically designed to move the school system

6

towards unitary status. *See* May 14th Order, at Ex. A; Joint Motion at 3 (noting that attendance zones were drawn "in order to bring the School district into full compliance with the Constitution"); *see also id.* at Attach. A (school attendance zones maps, enrollment projections, and projected desegregation status). These zones were not drawn by the Court, but rather by the school system; they were considered by the parties (and the Court as well) to be so critical to achievement of unitary status that changes to them required Court approval. *See* May 14th Order at ¶1. After three years (presuming unitary status had not been achieved), the zones would automatically be reassessed and redrawn, always with the goal of achieving unitary status. *Id.*

Now, less than six months after approval of those zones, the JPSB proposes to convert Hazel Park Elementary as part of its Magnet Plan. *See* Magnet Plan, at ¶¶12-15. Unlike the Motion for New Magnet Programs, the conversion proposed in the Magnet Plan will change the attendance zone of four surrounding elementary schools: Airline Park, Green Park, Harahan, and Rudolph Matas. *Id.* The issue of most pressing concern for this Court is how this redrawing of the recently adopted school attendance zone map will affect the school system's progression towards unitary status. Simply put, does redrawing the map create more segregated schools, or fewer?

Unfortunately, the Court has encountered some difficulty in getting this basic question–indeed, in a school desegregation case, *the* basic question–fully answered. In the Magnet Plan, Defendants provided the Court with a projection of the increase in student population at the four surrounding schools that would be caused by converting Hazel Park. *Id.* at

¶13.[1] This projection did not include any information regarding the racial breakdown of students who would be reassigned to specific schools. However, the Magnet Plan did conclude that such reassignments would "result in two *new* desegregated schools–Airline Park Elementary School and Green Park Elementary School." *Id* at ¶14 (emphasis added). This conclusion overstated matters, since both Airline Park and Green Park were already projected to be desegregated under the original school attendance zone plan approved on May 14, 2008. *See* Joint Motion at Attach. A (noting both Airline Park and Green Park as "Desegregated"). The Magnet Plan is also silent as to the effect of the Hazel Park conversion on the other two schools, Harahan and Rudolph Matas.

This uncertainty caused the Court to request, at the December 12th hearing, information on how redrawing the boundaries would affect the racial demographics of the neighboring schools. Tr. at __ (Hearing of December 12, 2008).[2] The Defendants complied and filed the requested material on December 18, 2008. *See* Mot. to Supp. Hearing Rec., at ¶1 (hereinafter

---

[1] These projections seem to be based on the assumption that every student in Hazel Park will be reassigned to a surrounding school, an assumption that is made explicit in the supplemental filing requested by the Court. *See* Mot. to Supp. Hearing Rec., at ¶1 (hereinafter "Supplement") (Rec. Doc. 189). Of course, as was noted in the Plan itself, *see* Magnet Plan at ¶15, and as Defendants noted repeatedly at the fairness hearing, *see* Tr. at __ (Hearing of December 12, 2008), some unknown number of present Hazel Park students will stay at the school even after its conversion, since they will attend the magnet program. Additionally, the migration of affected students to neighboring schools would not happen all at once, but would happen as new grades in the magnet program come "online." *See* Magnet Plan at ¶12. As such, the Defendants' projections are at best guesses, and it is unclear how the proposed conversion would actually affect the population of the neighboring schools. Of course, given the mobility of the population and countless other socioeconomic factors that affect school demographics, all such projections are guesses. The Court accepts this uncertainty as inherent in the process, and will employ the projections as the best educated guess of the JPSB, absent a showing that any other methodology is more sound.

[2] A full transcript of the December 12th hearing has not yet been prepared. Once it has been completed, the Court will re-issue this Order with the corrected page numbers.

"Supplement") (Rec. Doc. 189). In this iteration, the JPSB claimed, more accurately, that Airline Park and Green Park "are projected to be desegregated schools." *Id.* at ¶1. The Supplement noted that the population of Harahan and Rudolph Matas would not be desegregated, but rather racially-identifiable white, with minimal changes in the student population. *Id.* If the conversion went forward, Defendants concluded, the school system would "realize an increase of one in the number of desegregated schools." *Id.*

The Court is uncertain how Defendants reached this conclusion, and the existing record seems to refute it. Under these projections, the JPSB claims, Airline Park, Green Park, and Harahan would have the same desegregation status as they did in the original school attendance zone plan–that is, the first two would remain "desegregated" while the last would remain "racially-identifiable white." *See* Joint Motion at Attach. A (noting Harahan as "racially-identifiable white"). But in the original school attendance zone plan, Rudolph Matas is actually listed by JPSB and Plaintiffs as "desegregated." *Id.* On the other hand, the Magnet Plan notes that after the proposed conversion of Hazel Park, Rudolph Matas will become "racially-identifiable white." Supplement at ¶1.[3] Thus by this Court's count, implementing Magnet Plan would result in a *decrease* in the number of desegregated schools in Jefferson Parish.[4] This is simply not progress towards unitary status, and as such this Court is unable to conclude that Defendants have carried their burden of showing that the Magnet Plan is reasonable, fair, and

---

[3] Relevant excerpts from the Joint Motion showing the approved school attendance zone plans are attached to this order as Attachment A.

[4] To say nothing of the fact that Hazel Park, the school scheduled for conversion, is already listed as a desegregated school in the original school attendance zone plan approved on May 14, 2008. *See* Joint Motion at Attach. A (noting Hazel Park as "desegregated").

9

adequate.

## III. CONCLUSION

The Court wishes to emphasize the precise scope and effect of this order. First, aspects of the Magnet Plan unrelated to the change in attendance zones–such the establishment of appropriate curricula, acquisition and renovation/upgrade of facilities, and teacher selection and retention–are unobjectionable and, indeed, evidence much thought and careful planning. It is hoped that any future Magnet Plan retains such high-quality features. Most importantly, the Court's order today does not require the school system to dismantle or change its existing magnet programs, which have been in operation this school year pursuant to ¶¶5-6 of the May 14th Order. In the interim period prior to approval of a revised Magnet Plan, those programs–including those programs approved by the Court today, *see supra* at §II(B)–can continue in operation.

However, the Court is unable to approve the change in the existing (and recently adopted) school zone attendance plan. Once the school system achieves unitary status, the JPSB will be free–as is proper in our federal system, which largely assigns the task of education to local and state governments–to employ any constitutional means to administer its magnet school program, including conversion of an existing desegregated school such as Hazel Park. The citizens of Jefferson Parish can sustain the JPSB in its decisions, or object at the ballot box. But until the achievement of unitary status, this Court is bound to view any proposal to alter the terms of the May 14th Order through the prism of how the change would impact the school system's progress towards that status. The JPSB must be able to show that any proposal to alter the May 14th Order moves the school system toward unitary status. In this instance, it has not

made that showing.

Accordingly, **IT IS ORDERED** that the Motion for Approval of the Advanced Magnet Studies Plan (Rec. Doc. 186) is hereby **DENIED**. The parties are **ORDERED** to submit to the Court a revised Magnet Plan pursuant to ¶6 of the May 14th Order no later than 120 days from the date of this Order. In the interim period prior to approval of the revised Magnet Plan, the provisions of ¶¶5-6 of the May 14th Order regarding the enrollment of present magnet students shall remain in force.

New Orleans, Louisiana, this 5th day of January, 2009.

_____
**KURT D. ENGELHARDT**
**United States District Judge**



AIRLINE PARK ELEMENTARY
Projected Total Enrollment: 340
Projected Black Enrollment: 179
Projected White Enrollment: 128
Desegregated

Boundary Description:
From the Soniat Canal and West Napoleon Ave. (south side incl.); east to Elise Ave. (west side incl.); south to West Metairie Ave. (north side incl.); west to Eisenhower Ave. extended (incl.); south to Airline Dr. (incl.); west to Lester Ave. (incl.); south to Illinois Central Railroad (north side incl.); west to Howard Ave. (incl.); north to Airline Dr. (south side incl.); east to N. Wilson Ave. (incl.); northeast to the Soniat Canal (east side incl.); north to West Napoleon Ave.



GREEN PARK ELEMENTARY
Projected Total Enrollment: 348
Projected Black Enrollment: 90
Projected White Enrollment: 212
Desegregated

Boundary Description:
From N. Sibley Ave. and West Napoleon Ave. (south side incl.); east to the Soniat Canal (west side incl.); southeast to N. Wilson Ave. (excl.); southwest to Airline Dr. (north side incl.); west to Howard Ave. (excl.); south to the Illinois Central Railroad (north side incl.); west to Sibley Ave. (incl.); northeast to W. Napoleon Ave.

13



HARAHAN ELEMENTARY
Projected Total Enrollment: 398
Projected Black Enrollment: 83
Projected White Enrollment: 276
Racially Identifiable White

Boundary Description:
From Clearview Pkwy. and the Mississippi River; north along Clearview Pkwy. (west side incl.) to the Illinois Central Railroad (south side incl.); west to the Soniat Canal (east side incl.); south to Folse Dr. extended (excl.); southwest to the Mississippi River; east along the Mississippi River to Clearview Pkwy.



HAZEL PARK ELEMENTARY
Projected Total Enrollment: 422
Projected Black Enrollment: 209
Projected White Enrollment: 193
Desegregated

Boundary Description:
From the Mississippi River and Folse Dr. (incl.); northeast to the Soniat Canal (west side incl.); northwest to the Illinois Central Railroad (south side incl.); west to Williams Blvd. (east side incl.); south to the Mississippi River; east along the Mississippi River to Folse Dr.



RUDOLPH MATAS ELEMENTARY
Projected Total Enrollment: 266
Projected Black Enrollment: 85
Projected White Enrollment: 160
Desegregated

Boundary Description:
From Elise Ave. and W. Napoleon Ave. (south side incl.); east to Clearview Pkwy. (west side incl.); south to Park Dr. North (incl.); southwest to Transcontinental Dr. (west side incl.); south to Airline Dr. (north side incl.); west to Haring Dr. (incl.); south to Illinois Central Railroad (north side incl.); west to Lester Ave. extended (excl.); north to Airline Dr. (excl.); east to Eisenhower Ave. (excl.); north to W. Metairie Ave. (south side incl.); east to Elise Ave. (east side incl.); north to W. Napoleon.